952 A.2d 414

**LOVELL LAND, INC.**

v.

**STATE HIGHWAY ADMINISTRATION et al.**

No. 1594, Sept. Term, 2007.

Court of Special Appeals of Maryland.

July 3, 2008.

**726**

728

Kurt J. Fischer (Marta D. Harting, Melissa L. Mackiewicz, DLA Piper US LLP on the brief), Baltimore, for Appellant.

Kevin Reynolds, Baltimore and Richard E. Basehoar, Ellicott City (Douglas Gansler, Atty. Gen., Margaret Ann Nolan, Howard County Solicitor on the briefs), for Appellee.

Panel: DAVIS, BARBERA and J. FREDERICK SHARER (retired, specially assigned), JJ.

DAVIS, Judge.

Appellant, Lovell Land, Inc., filed a complaint for declaratory and injunctive relief in the Circuit Court for Howard County on April 25, 2006 against appellees, the State Highway Administration (SHA) and Howard County (County). Appellant sought a declaratory judgment that (1) its predecessor-in-interest, King's Meade Limited Partnership (King's Meade), is a third party beneficiary of a deed executed by appellees, under which the SHA conveyed 17.337 acres of land to the County subject to the condition that, if the County should cease using the property for a public purpose, the property would revert to the SHA and that (2) the County has not used the property for a public purpose. Accordingly, appellant requested that the circuit court issue a permanent injunction,

requiring the County to convey the property at issue to the SHA and order the SHA, within thirty days after such conveyance, to offer appellant the right of first refusal to reacquire the property at not more than its current market value, pursuant to § 8–309(c)(1)(i) of the Maryland Code (1977, 2001 Repl.Vol., 2007 Supp.), Transportation Article.[1]

Appellees subsequently moved for summary judgment on various grounds. On March 23, 2007, the circuit court (Leasure, J.), conducted a hearing on the motions. By Order and Memorandum Opinion dated August 17, 2007, the circuit court found that appellant was not an intended third party beneficiary to the deed entitled to maintain an action and, thus, granted summary judgment in favor of appellees. Appellant timely noted an appeal, presenting the sole question for our review:

> Is [appellant], as the successor-in-interest to King's Meade, a creditor third party beneficiary of the Reverter Clause in the SHA/County Deed where: (1) under the express terms of the Reverter Clause interpreted in light of the applicable statute, [§ 8–309], King's Meade is the only party that can benefit from the Reverter Clause; and (2) the SHA included the Reverter Clause in the SHA/County Deed in direct response to King's Meade's claim that the SHA was required to convey the property to King's Meade under § 8–309 because the County did not have a public purpose for the property?

Appellees also filed a cross-appeal in order to preserve alternative grounds for summary judgment, which were either resolved in favor of appellant or left undetermined by the trial court. In its cross-appeal, appellees present the following two questions for our review:

> I. Are [appellees] entitled to summary judgment on the alternative ground that the Subject Property was transferred to [the County] as an adjacent property

---

**1.** Unless otherwise indicated, we shall refer to the Md.Code (1977, 2001 Repl.Vol., 2007 Supp.), Transportation Article, § 8–309.

owner as part of the consideration of a right-of-way transaction pursuant to [§ 8–309(f) ] under which conveyance for a public purpose was not required?

II. Are [appellees] entitled to summary judgment on the alternative ground that [appellant's] claims are barred by the statute of limitations where the Complaint in this action was filed (1) more than five years after [appellant] first put [appellees] on notice of the claims asserted in the Complaint and that it would take any and all actions to protect its rights and; (2) more than three years and five months after counsel for [appellant] demanded that [the SHA] exercise the Reverter Clause, regain title to the Subject Property, and convey it to [appellant]?

For the reasons that follow, we affirm the grant of summary judgment in favor of appellees only on the grounds relied upon by the Circuit Court for Howard County.

## FACTUAL & PROCEDURAL BACKGROUND

On January 26, 1988, appellees entered into a Bi–Party Agreement which effectively formalized their plans to cooperate with one another in the construction of Maryland Route 100 from Interstate 95 to U.S. Route 29 in Howard County. The Bi–Party Agreement sets forth the duties and obligations of appellees with respect to roadway design, construction, acquisition of land and allocation of costs associated with the construction of the Route 100 project.

In furtherance of the project, on January 18, 1989, the SHA entered into an agreement with BritAm Development Group (BritAm) to exchange parcels of land. At the time, BritAm's general partners were the Brantley Development Corporation and King's Meade. It was agreed that BritAm would convey land to the SHA for the Route 100 project and that, subject to the approval of the Board of Public Works, the SHA would convey land that it owned to BritAm for the expansion of BritAm's proposed residential subdivision known as "Brightfield."

Meanwhile, the County desired to acquire land near the planned alignment of Route 100, located in the vicinity of Maryland Route 108 and Montgomery Road for an "important public purpose." Specifically, the property included land that was immediately to the South of and adjacent to the 19.982 acres of land that the SHA was in the process of acquiring from King's Meade. By deed dated March 29, 1990, the County acquired approximately 28.5686 acres from the "State of Maryland for to [sic] the use of the University of Maryland System (formerly the Board of Regents of the University of Maryland)" for the sum of $799,920.80. The property was transferred to the County subject to covenants running with the land, restricting the County's use of the land so that it shall not be utilized for "any commercial or other non-governmental purposes" and that, in the event of a breach of that covenant, the property would revert to the State of Maryland.

Three years after the agreement between BritAm and the SHA, King's Meade, pursuant to a series of deeds dated April 9, 1992, transferred approximately 19.982 acres of land to the SHA and the SHA transferred approximately 8.2 acres of land to King's Meade for the purposes of its residential subdivision. The SHA paid King's Meade the additional sum of $139,600.

Following these initial acquisitions of land, the alignment of Route 100 shifted to the South. Under the new alignment, most of the 19.982 acres of land acquired from King's Meade was not needed for the Route 100 right-of-way. Instead, approximately 12.354 acres of land acquired by the County from the University of Maryland System was used in the construction. As a result of the realignment, 17.337 acres of land (Subject Property) were no longer needed for the Route 100 project. The Subject Property is comprised of approximately 15.849 acres that the SHA acquired from King's Meade, approximately .732 acres that the County acquired from the University of Maryland System and .756 acres that the SHA acquired from James Haker.[2]

---

2. The SHA raises a third issue in its cross-appeal, "Are [appellees] entitled to partial summary judgment on the alternative grounds that

To accommodate the southern realignment of the Route 100 project, on November 26, 1996, appellees entered into a Supplemental Agreement to the Bi–Party Agreement (1996 Supplemental Agreement), wherein the parties agreed to exchange twelve separate parcels of land. The County, subject to the approval of the County Council, agreed to transfer nine parcels, totaling approximately 47.050 acres, to the SHA. Comparatively, the SHA, subject to the approval of the Board of Public Works, agreed to transfer three parcels, totaling approximately 52.5 acres, to the County and to pay the County the sum of $1,607,116. Among the parcels of land to be exchanged was the Subject Property. In accordance with the 1996 Supplemental Agreement, the SHA would convey the 52.5 acres by the SHA's form quitclaim deed and subject to a covenant that the County "shall not use the herein conveyed property to allow its use for any non-transportation related purpose." The 1996 Supplemental Agreement provides, in relevant part:

> WHEREAS, [the SHA] and the COUNTY agree that the MD 100 PROJECT and the IMPROVEMENTS would be a benefit to both parties of this SUPPLEMENTAL AGREEMENT and a necessary accommodation for the general traveling public and that it promotes the health, safety, and general welfare of the citizens of the State and the COUNTY.

Approximately three years after the execution of the 1996 Supplemental Agreement, King's Meade contacted the SHA and asserted its right to repurchase the Subject Property

---

[the SHA] acquired only 15.849 of the subject 17.337 acres from King's Meade and that [appellant] cannot claim to be the successor-in-interest with regard to the remaining 1.488 acres?"

Upon our review of the record, there can be no dispute that King's Meade was the former owner to only 15.849 of the 17.337 acres of Subject Property. It does not appear that the trial court made this factual finding, but assumed for the purposes of the summary judgment motions that appellant is successor-in-interest to all of the Subject Property. Because we affirm the trial court's grant of summary judgment as to all of the Subject Property, we shall not reach this third issue. We, however, do not wish to misstate the facts in the record.

under § 8–309(c). In response to King's Meade's demands, a representative of the SHA faxed the 1996 Supplemental Agreement to King's Meade and advised King's Meade that the Subject Property was to be conveyed to the County as provided for in the 1996 Supplemental Agreement.

By letter dated January 13, 2000, counsel for King's Meade objected to the conveyance, claiming that the Subject Property could not be conveyed to the County unless the County demonstrated a "transportation use" for the Subject Property. According to King's Meade, in the absence of such a demonstration, the SHA, pursuant to § 8–309, must first offer the Subject Property to King's Meade for reacquisition.

Responding by letter dated March 30, 2000, the SHA notified King's Meade that the SHA and the County were "in the process of executing an Amendment to the [1996 Supplemental Agreement]" and that, "[u]nder this Amendment, [the County] may use King's Meade property for a public purpose, and [the SHA] will convey the King's Meade property to [the County] under [§ 8–309(g) ]." The amendment to the 1996 Supplemental Agreement entitled "Amendment I to a 11/20/96 Supplemental Agreement to a 01/26/88 Bi–Party Agreement" (Amendment I) was drafted on March 24, 2000 and signed by the County Executive on March 29, 2000.

Prior to the execution of Amendment I, counsel for King's Meade informed the SHA that, unless the County could demonstrate a public use for the Subject Property, the SHA could not convey the Subject Property under § 8–309(g). In its letter dated April 12, 2000, King's Meade asserted that, "[a]s you know, § 8–309 does not empower the SHA to transfer land to another governmental entity just because the governmental entity may have a fancy for the land" and that, "this letter puts the SHA and [the County] on notice that any purported transfer of the King's Meade property to the County is illegal and invalid since the property was not first offered to the former property owner."

An attorney on behalf of the SHA immediately responded to King's Meade's objections and advised that the SHA's pro-

posed transaction with the County met "the requirements of § 8–309(f) . . . as a conveyance of 'surplus land to an adjacent property owner: (i) as all or part of the consideration for a right-of-way transaction.' " The April 13, 2000 letter explains that the County qualifies as "an adjacent property owner" and that the properties are being "acquired as consideration for the right-of-way transactions with the County in order to acquire properties needed for the construction of the Route 100 project." Because the Subject Property was being transferred under § 8–309(f), King's Meade was informed that it "ha[d] no rights which impact on [the SHA's] ability to convey the property." The letter concluded, requesting that if King's Meade "continues to assert that it has an interest which interferes with [the SHA's] ability to complete this transaction pursuant to § 8–309(f)(1) please explain the basis of that claim."

On April 18, 2000, Amendment I was executed with the following provisions:

> WHEREAS, [the SHA] further agrees that pursuant to [§ 8–309(g) ] and its 1999 Supplement, [the SHA] may convey the INTENDED COUNTY LAND, with the approval of the Board of Public Works, to the COUNTY provided the COUNTY'S use of the INTENDED COUNTY LAND is restricted to use for a public purpose.

In addition to amending the 1996 Supplemental Agreement to change the prohibition on use of the Subject Property from a "non-transportation purpose" to a restriction on use for a "public purpose," the parties agreed that "Amendment I shall inure to and be binding upon, the parties thereto" and that "[t]he recitals (WHEREAS clauses) are incorporated herein as part of this Amendment."

On the same day that Amendment I was executed, King's Meade's attorney wrote to the SHA and asserted that the transaction is not authorized by § 8–309(f)(1) because subsection (f) does not authorize transfers to public agencies. Expounding upon its claim, King's Meade wrote:

The fact that § 8–309(f) does not explicitly set forth a public use requirement simply demonstrates that the Maryland legislature never intended this section to apply to a transfer of property to a public agency. Clearly, the term 'property owner' as used in § 8–309(f) means private property owners and not a public agency.

Moreover, § 8–309 must be read in conjunction with the entire statute. Section 8–309(a) describes that the purpose of the section is 'to return unneeded land to the tax rolls of the counties and to make this land available for a use by county or municipality for any transportation purpose.' Similarly, [§ 8–309(b) ] provides that 'if land acquired under this subtitle is not needed for present or future State, county, or municipal transportation purpose or other public purposes, the [SHA] shall dispose of the land as soon as practical after the completion or abandonment of the project for which the land was acquired.'

King's Meade again demanded that it had the right to reacquire the Subject Property under § 8–309(c) and that it would take any and all actions to protect its rights thereto.

Contemporaneously with the exchange of correspondence between the SHA and King's Meade, the SHA drafted a deed (SHA/County Deed) to transfer the Subject Property to the County. The SHA/County Deed provides, in pertinent part:

WHEREAS, pursuant to the [1996 Supplemental Agreement] and subject to the approval of the Board of Public Works of Maryland, the [SHA] has agreed to exchange with [the County] certain lands hereinafter described, which the [SHA] has determined are no longer needed by it in connection with the construction, operation, maintenance, use and protection of the State Highway System, for certain other lands owned by [the County] which are required by the [SHA] for its highway system; and

WHEREAS, under the provisions of [§ 8–309], it is necessary for the Board of Public Works of Maryland to join in the conveyance of any land by the [SHA]

NOW, THEREFORE, THIS DEED WITHESSETH: ... so long as the property herein conveyed is used for a public purpose, the said parties of the first part and the second part do hereby grant, convey, and quit claim unto [the County] ... 17.337 acres of land ... however, in the event said property shall cease to be used for a public purpose, [the SHA], its successors and assigns, shall have the right to reenter and take possession of the property and terminate the right, title, and interest of [the County], its successors and assigns, in and to the said property, and all such right, title and interest shall revert to the State of Maryland to the use of the [SHA], its successors, assigns, in fee simple for no monetary consideration....

\* \* \*

TO HAVE AND TO HOLD the land and premises, hereinbefore described and mentioned, to the extent of the State's right, title and interest thereto, unto [the County], a body corporate and politic, its successors and assigns, so long as the said property shall be used for a public purpose. Notwithstanding anything to the contrary contained herein, in the event said property shall cease to be used for a public purpose, or is required at a future date for a transportation purpose, all right, title, and interest in same shall immediately revert to the State of Maryland to the use of the [SHA], its successors and assigns, free and clear of any liens and encumbrances imposed upon the property by the [County], or any successors or assigns. (Reverter Clause)

The SHA/County Deed was signed by the County on April 7, 2000 and by the SHA on April 12, 2000, respectively. The SHA/County Deed was then submitted to the Board of Public Works for its approval during its April 26, 2000 meeting. The "remarks" on the Board of Public Works' Agenda for the meeting include the following:

Approval of conveyance is requested in accordance with [§ 8–309(f)(1)(ii) ].

The subject property was acquired in 1992 as part of an alignment alternate that was ultimately not used for the MD 100 project.

During negotiations for fee simple right of way needed for MD 100, [the County] expressed a desire to obtain the subject parcel and others from [the SHA] for public purposes. As a result, [the SHA] and [the County] entered into various agreements to accomplish the land transactions. Permission to dispose of the parcel is being requested concurrent with the deed submission to accommodate [the County].

The Deed has been forwarded to the Executive Secretary, Board of Works for execution.

The notations on the Agenda indicate that the Board of Public Works approved the conveyance and the SHA/County Deed on April 26, 2000. The SHA/County Deed was thereafter executed by the Board of Public Works on May 3, 2000. Accordingly, the SHA/County Deed, "made [May 3, 2000] from the [SHA], party of the first part; and the [Board of Public Works], party of the second party," conveyed unto the County the Subject Property.

On May 1, 2000,[3] after a short lapse in time, counsel for the SHA responded to King Meade's April 18, 2000 letter, asserting:

The bottom line is that the County has represented to [the SHA] that it will use the Property for a public purpose. [The SHA] has relied on that representation, just as it would rely on such a representation from any public entity. In addition, [the SHA's] deed to the County contains a reverter clause that states if the land is not used for a public purpose, it will revert to [the SHA]. If that occurs, [the SHA] will deal with the reversion in an appropriate manner at that time. The reverter language is the standard method by which [the SHA] ensures that the land it sells will be used for a legitimate public purpose.

---

**3.** Counsel for the SHA apologized for the "time lapse in responding" and explained that she "was out of the office until just a few days ago."

Approximately eighteen months after the execution of the SHA/County Deed, counsel for King's Meade, by letter dated November 16, 2001, demanded that the SHA exercise its right under the Reverter Clause to gain title to the Subject Property. King Meade's demand came after the Subject Property had been included in an advertisement for the sale of county-owned land prepared by Manekin, Inc. King's Meade asserted that, once the SHA regained title of the Subject Property, the SHA was to offer the Subject Property to King's Meade or its successors pursuant to § 8–309. According to King's Meade, the failure of SHA to do so would subject the SHA to monetary damages of not less than $1,000,000.

In response, the SHA explained to King's Meade that, after the Subject Property's use as a school site was rejected, the property was mistakenly identified and placed on the market for sale by Manekin, Inc. According to the County, the County Council had neither considered nor approved of disposing of the Subject Property. Counsel for the SHA also informed King's Meade that it did not consider the mistaken advertisement to be a breach of the Reverter Clause and advised that the Subject Property would remain under the County's control.

On April 25, 2006, appellant, claiming to be the sole successor-in-interest to King's Meade, filed a complaint for declaratory judgment and injunctive relief against appellees. The Complaint alleged that King's Meade and its successors were third party beneficiaries of the Reverter Clause and that the County had breached the Reverter Clause. The Complaint also sought an order requiring the County to convey the Subject Property to the SHA and for the SHA, within thirty days thereafter, to offer the Subject Property to appellant at its current market value.

On September 12, 2006, the County filed a motion for summary judgment, arguing (1) that King's Meade was not an intended third party beneficiary of the SHA/County Deed; (2) that the County was entitled to and did receive the Subject Property as an adjacent property owner under § 8–309(f); (3)

that appellant's claims, on behalf of King's Meade, were barred by the statute of limitations and (4) that, because there existed two county capital projects proposing public uses for the Subject Property, the County was not in violation of the Reverter Clause. For the purposes of the motion, the County assumed that appellant was a successor-in-interest to the assets of King's Meade.

Before responding to the County's motion, appellant requested and the parties agreed that appellant would receive responses to certain discovery that it had served upon the County. Appellant also proposed and the parties agreed that appellant would forego discovery regarding the capital projects and that the County would reserve making the argument that it did not violate the Reverter Clause until the trial court determined whether the County was entitled to summary judgment on any of the other grounds advanced in its motion.

After appellant's response to the County's motion was filed, the SHA moved for summary judgment, adopting the arguments of the County. Following oral argument on the motions, the trial judge entered a Memorandum Opinion. Because the SHA sought summary judgment on the same grounds as the County, the trial judge addressed both motions concurrently. The trial judge found that the SHA conveyed the Subject Property to the County pursuant to § 8–309(g) and that neither King's Meade nor appellant was an intended third party beneficiary entitled to maintain an action based upon a claimed breach of the Reverter Clause. Accordingly, the trial court granted summary judgment in favor of appellees.

## STANDARD OF REVIEW

Upon review of an order granting a motion for summary judgment,[4] appellate courts, "must determine whether the trial court was legally correct." *Maryland Cas. Co. v. Lorkovic*, 100 Md.App. 333, 354, 641 A.2d 924 (1994) (citing *Beatty v.*

---

**4.** Maryland Rule 2–501(a) provides that "[a]ny party may make a motion for summary judgment on all or part of an action on the ground

*Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993)). In reviewing the determinations of law, "we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party." *Remsburg v. Montgomery,* 376 Md. 568, 579–80, 831 A.2d 18 (2003).

"Though not a substitute for a trial, a grant of summary judgment should not be disfavored and should be granted unless there exists some truly disputed material fact." *Collins v. Li,* 176 Md.App. 502, 591, 933 A.2d 528 (2007). A material fact is one that "will 'somehow affect the outcome of the case.'" *Id.* (citations omitted). As we said in *Collins,*

> [O]nly a genuine dispute as to a material fact is relevant in opposing a motion for summary judgment. Summary judgment is not foreclosed if a dispute exists as to a fact that is not material to the outcome of the case. When the moving party has set forth grounds sufficient for the grant of summary judgment, the opposing party must show with some precision that there is a genuine dispute of a material fact. Facts must be proffered by the opposing party which would be admissible in evidence. The requirement of a genuine issue of material fact is more than the existence of some alleged factual dispute and irrelevant factual disputes are not a genuine dispute of material fact.
>
> If a fair-minded jury could return a verdict for the opposing party, then the trial court should not grant summary judgment. Even if the facts are undisputed, should they be susceptible to inferences that support opposition to the motion, the grant of summary judgment was improper.

*Id.* (internal quotations and citations omitted).

## ANALYSIS

### A.  Parties' Contentions

Appellant posits that the statutory provisions in effect at the time the SHA/County Deed was executed are incorporated

---

that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law."

into the deed and that it is assumed that appellees had knowledge of the applicable law. *See Denice v. Spotswood I. Quinby, Inc.,* 248 Md. 428, 433–34, 237 A.2d 4 (1968). *Ergo,* appellant argues that the express language of the Reverter Clause, interpreted in light of § 8–309, establishes that King's Meade and its successors are third party beneficiaries. According to appellant, the Reverter Clause was included in the SHA/County Deed for the purpose of ensuring compliance with § 8–309 and, because the terms of the Reverter Clause confer a benefit to which *only* King's Meade and its successors can enjoy, appellant is a third party beneficiary entitled to recover on and enforce the SHA/County Deed.

More specifically, appellant contends that King's Meade was a creditor beneficiary of the Reverter Clause as evidenced by the correspondence between King's Meade and the SHA. Prior to the execution of the SHA/County Deed, King's Meade asserted that the County was obligated to use the Subject Property for a public purpose under § 8–309(g) and that, if the County failed to do so, the SHA must provide King's Meade and its successors with an opportunity to reacquire the property pursuant to § 8–309(c)(1). Based upon its asserted claim, appellant asseverates that the SHA included the Reverter Clause in the SHA/County Deed to the benefit of King's Meade. Consequently, appellant argues that the SHA, as promisee, expressly procured this promise from the County to satisfy King's Meade's claim against the SHA.

Appellees counter that appellant failed to produce evidence which could support an inference that they intended the Reverter Clause to confer a direct benefit upon appellant, as successor-in-interest to King's Meade. To the contrary, appellees contend that the express language of the SHA/County Deed and the underlying contractual agreements thereto, the correspondence between the parties and the submission of the conveyance to the Board of Public Works for approval under § 8–309(f) clearly indicate that appellees intended the Reverter Clause to be for their mutual benefit to the exclusion of appellant. According to appellees, appellant's assertion that it

is the *only* entity which could benefit from the Reverter Clause is disingenuous.

In raising their first alternative argument, appellees maintain that the conveyance of the Subject Property occurred pursuant to § 8–309(f) and not § 8–309(g) as the trial court found. Because § 8–309(f) does not require the conveyance to be for an intended public purpose, appellees argue that the Reverter Clause was not included to satisfy an obligation imposed by law and is solely a matter of contract between the SHA and the County to which there can be no third party beneficiaries.

Appellees also contend that summary judgment should be granted in their favor because, between counsel for King's Meade and appellant, the entities have been threatening the present action since 2000. Accordingly, appellees assert that any claimed violation under § 8–309 or claimed entitlement to purchase all or part of the Subject Property is barred by the general three-year statute of limitations.

### B. Statutory Framework of § 8–309

To properly resolve the issues before us, we deem it first necessary to outline select provisions of § 8–309 pertaining to the acquisition and disposition of property. To begin, the purpose of § 8–309 is "to return unneeded land to the tax rolls of the counties and to make this land available for use by a county or municipality for any transportation purpose." § 8–309(a).[5] Consistent with this purpose, "Notwithstanding any other statute to the contrary, if land acquired under this subtitle is not needed for present or future State, county, or municipal transportation purpose or other public purposes, the [SHA] shall dispose of the land as soon as practicable after the

---

**5.** The 1983 repeal and re-enactment of § 8–309(a), *see* 1983 Md. Laws, Chap. 547, effective July 1, 1983, altered the purpose statement by removing "use by private enterprise" and substituting it with "use by a county or municipality for any transportation purpose." *Selig v. State Highway Admin.,* 383 Md. 655, 674, 861 A.2d 710 (2004). The 1983 revisions granted a county or municipality a priority of acquisition superior to that of the original owner. *Id.*

completion or abandonment of the project for which the land was acquired." § 8–309(b)(1). "As to land from a completed project," § 8–309(c)(i)(*l*)[6] requires that the SHA "notify the person from whom the land was acquired, or the successor in interest of that person," within thirty days after making the determination that the land is not needed and that it is available for reacquisition.

Under certain circumstances, § 8–309 authorizes the SHA to dispose of unneeded land from a completed project without first offering the property to the former owner. Section 8–309(f), which governs the conveyance of surplus property to an adjacent landowner, provides:

(1) Except as required by this section for property from an abandoned project, this section does not prevent the *[SHA] from conveying any of its surplus land to an adjacent property owner:*

(i) *As all or part of the consideration for a right-of-way transaction;* or

(ii) If the [SHA] believes that public auction of the surplus land will affect adversely the value or use of the surplus land, on a negotiated sale with a price based on the appraised value of the land.

(2) If the [SHA] believes that any land proposed for sale under this subsection has a value of more than $25,000, the

---

**6.** Section 8–309(c)(1)(i), provides, in pertinent part:

As to land from a completed project:

1. The [SHA] shall notify the person from whom the land was acquired, or the successor in interest of that person, within 30 days after making a determination that the land is not needed by the [SHA] and that the land is available for reacquisition.

2. Within 5 years from the date the land was acquired, the person from whom the land was acquired, or the successor in interest of that person, may reacquire the land, on payment of an amount equal to the consideration that the [SHA] or Commission originally paid for the property; and

3. After 5 years from the date the land was acquired, the person from whom the land was acquired, or the successor in interest of that person, has the right to reacquire the land at the current market value.

land shall be appraised by at least one independent, qualified real estate appraiser.

(3) *If the Board of Public Works approves the sale and the deed, the [SHA] may execute a deed conveying the land to the adjacent property owner.*

§ 8–309(f) (emphasis added).

By comparison, § 8–309(g), which prescribes the procedures for disposing of "surplus land to any State or local agency," provides:

Except as required by this section for property from an abandoned project, this section does not prevent the [SHA], *with the approval of the Board of Public Works, from conveying any of its surplus land to any State or local agency that:*

(1) *Needs the property for a public purpose; and*

(2) Pays the [SHA] an amount equal to the lesser of:

(i) The appraised value of the land; or

(ii) The consideration that the [SHA] or Commission originally paid for the land, plus simple interest at the fair market rate calculated from the time acquisition to the time of disposition and administrative costs.

(Emphasis added).

## C. Applicable Subsection Governing the Conveyance

In raising their first alternative argument, appellees maintain that the conveyance of the Subject Property occurred pursuant to § 8–309(f) and not § 8–309(g), as the trial court found. According to appellees, after King's Meade declared that the SHA had no authority to transfer the Subject Property pursuant to § 8–309(f), "as a resounding expression of having absolutely no intent to benefit [appellant], [the SHA] did exactly what counsel for [King's Meade] had advised was forbidden," submitted the conveyance to the Board of Public Works for approval under § 8–309(f).

Because the sole issue that appellant raises rests upon an intent to benefit and because appellees, in their third party

beneficiary analysis, argue that the SHA/County Deed execut-
ed pursuant to § 8–309(f), confirms their intent to benefit
themselves to the exclusion of King's Meade and its succes-
sors, we shall first address whether the trial court erroneously
found the conveyance to be governed by § 8–309(g).

On appeal, the question before us is whether the
ruling of the trial court from which the appeal lies is correct
and not whether the ruling has been based on proper grounds
or reasons. *J.A. Laporte Corp. v. Pennsylvania–Dixie Ce-
ment Corp.*, 164 Md. 642, 165 A. 195 (1933). Ordinarily,
appellate courts review the grant of summary judgment only
on the grounds relied upon by the trial court, but if the
alternative ground is one upon which the circuit court would
have no discretion to deny, summary judgment may be grant-
ed for a reason not relied upon by the trial court. *Vogel v.
Touhey*, 151 Md.App. 682, 706, 828 A.2d 268 (2003). Here,
there is no need for this Court to declare that the trial court
would have no discretion to deny summary judgment because
w e are affirming the grounds relied upon by the trial court.

In making its finding, the trial court relied upon parol
evidence, specifically Amendment I.[7] According to appellees,
the rights of the parties are governed exclusively by the
SHA/County Deed and, therefore, the language of Amend-
ment I should not have been considered by the trial judge.
Appellant contends, however, that, in light of the agreements
executed prior to the conveyance, it is clear that § 8–309(g)
governed the transaction. Bolstering its argument that the
conveyance occurred under § 8–309(g), appellant maintains
that the land transaction could not have occurred pursuant to
§ 8–309(f) because the County does not meet the statutory
definition of "adjacent property owner."

"It is an accepted rule that a *prima facie* presump-
tion arises from the acceptance of a deed that it is an
execution of the entire agreement for the sale of the realty,

---

7. As mentioned *supra*, the SHA/County Deed generally provides that the
deed was executed under § 8–309.

and the rights of the parties in relation to the agreement are to be determined by the deed." *Dorsey v. Beads,* 288 Md. 161, 170, 416 A.2d 739 (1980) (quoting *Barrie v. Abate,* 209 Md. 578, 582-83, 121 A.2d 862 (1956)). The rule that prior negotiations and agreements are merged in a deed made in full execution thereof does not apply where the deed is not full, complete, and unambiguous and where it does not encompass the entire contract between the parties. *Gilbert Const. Co. v. Gross,* 212 Md. 402, 129 A.2d 518 (1957); *Kandalis v. Paul Pet Const. Co.,* 210 Md. 319, 123 A.2d 345 (1956); *Laurel Realty Co. v. Himelfarb,* 194 Md. 672, 72 A.2d 23 (1950); *Stevens v. Milestone,* 190 Md. 61, 57 A.2d 292 (1948). Parol evidence, therefore, "may be given of collateral facts relating to an agreement for the sale of realty, even though a deed has been executed, if the facts are consistent with the deed and do not tend to contradict it." *Dorsey,* 288 Md. at 170, 416 A.2d 739.

In the case *sub judice,* appellees intended the provisions of their prior agreements to survive. The Bi–Party Agreement, the 1996 Supplemental Agreement and Amendment I include language in their recitals, without substantive change, that the agreements "shall inure to and be binding upon the parties hereto[.]" In light of this clause, it is inconceivable that appellees intended the terms of their prior agreements to merge upon execution of the SHA/County Deed. Additionally, the SHA/County Deed references the 1996 Supplemental Agreement, i.e., *"pursuant to the [1996 Supplemental Agreement* ] and subject to the approval of the Board of Public Works of Maryland, the [SHA] has agreed to exchange with [the County] certain lands hereinafter described, which the [SHA] has determined are no longer needed by it ... for certain other lands owned by [the County] which are required by the [SHA] for its highway system."

Collateral to the SHA/County Deed is Amendment I, wherein appellees agree that, "pursuant to § 8–309(g)," the SHA may convey the Subject Property, with the approval of the Board of Public Works, to the County, "provided the County's use of the [Subject Property] is restricted for a public pur-

pose." Without contradiction to Amendment I, the SHA/County Deed provides that, "so long as the property herein conveyed is used *for a public purpose*," the parties agree to convey to the County the Subject Property and "in the event said property shall cease to be used *for a public purpose*," the Subject Property shall revert to the SHA. A clear requirement found only in subsection (g) is that the State or local agency "need the property for a public purpose."

It is not disputed that, at one point, the SHA claimed that the transaction would occur pursuant to § 8–309(f). In fact, the Board of Public Works' Action Agenda indicates that the approval of the conveyance was requested in accordance with § 8–309(f) and Title 14, Section 24, Chapter 5 of the Code of Maryland Regulations (COMAR) and for the consideration of "$0 (Even Land Exchange)." Although the State uses this representation to indicate that the conveyance of the Subject Property occurred pursuant § 8–309(f), it does not override the language of the SHA/County Deed, which includes a restriction on land use for a "public purpose" and the express terms of the agreements leading up to the conveyance, providing that the agreements were to "inure to and be binding upon" appellees. The fact that the SHA agreed to exchange the Subject Property with the County "for and in consideration of the sum of One Dollar ($1.00), and other good and valuable consideration," is not consistent with the conveyance having been transacted under § 8–309(f). The 1996 Supplemental Agreement details the "exchange of land," and provides that the County will transfer nine parcels to the SHA and the SHA will transfer three parcels to the County and pay unto the County the sum of $1,607,116.

The doctrine of merger by deed in this instance does not preclude us from considering parol evidence. When reviewing the SHA/County Deed and the prior agreements thereto, it is clear that the conveyance occurred pursuant to § 8–309(g). Given our conclusion that the SHA/County Deed was executed pursuant to subsection (g), we need not resolve the issues that appellant raises regarding whether subsection (f) applies to counties and municipalities.

## D. Possibility of Reverter and Third Party Beneficiary Status

It is well established that privity of contract is an essential element of a cause of action thereon and a contract cannot be enforced by one not a party to it. Ordinarily, a third party beneficiary contract arises when two parties enter into an agreement with the intent to confer a direct benefit on a third party, allowing that third party to sue on the contract despite his or her lack of privity. *Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 625, 726 A.2d 818 (1999). This is so because a duty to the third party is created by the contract. *Shofer v. Stuart Hack Co.,* 124 Md.App. 516, 529, 723 A.2d 481 (1999).

Although a person for whose benefit a contract is made can maintain an action upon the contract, that person must first demonstrate that the contract was intended for his or her benefit. In order for a third party beneficiary to recover for a breach of contract, it must clearly appear that the parties intended to recognize the third party as the primary party in interest and as privy to the promise. *Volcjak v. Washington County Hosp. Ass'n,* 124 Md.App. 481, 509, 723 A.2d 463 (1999). Accordingly, intent is the principal touchstone for determining whether a third party beneficiary contract exists. As the Court of Appeals explained in *Mackubin v. Curtiss–Wright Corp.,* 190 Md. 52, 57–58, 57 A.2d 318 (1948):

> [I]t is generally accepted that before a stranger to a contract can avail himself of the exceptional privilege of suing for a breach thereof, he must at least show that it was intended for his direct benefit. An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee. In order to recover it is essential that the beneficiary shall be the real promisee; *i.e.,* that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit. It must clearly appear that the parties intend to

recognize him as the primary party in interest and as privy to the promise.

(Internal citations omitted).

Unless one can sustain the burden of showing that the contract or a provision of the contract was for his *direct benefit,* he will not be permitted to recover on or enforce the contract. Where the primary purpose of an agreement is unrelated to a third party's interests, the third party will be deemed an "incidental beneficiary" with no authority to enforce the agreement. *Gray & Son, Inc. v. Maryland Deposit Ins. Fund Corp.,* 83 Md.App. 584, 592, 575 A.2d 1272 (1990).

The primary source for determining whether the parties intended a third party to have standing to enforce the contractual provisions is the language of the contract itself. *Volcjak,* 124 Md.App. at 509, 723 A.2d 463. On its face, the SHA/County Deed does not provide that the Subject Property will be offered for sale to King's Meade and its successors in the event that the Subject Property reverts to the SHA or imply that the Reverter Clause was included in the SHA/County Deed in recognition of appellant's asserted rights under § 8–309(c)(1)(i). In fact, King's Meade is neither mentioned nor named as a beneficiary in the SHA/County Deed.

Evidence of an intent to benefit a third party, however, can be shown by the surrounding circumstances. *Shillman v. Hobstetter,* 249 Md. 678, 688–89, 241 A.2d 570 (1968). We, therefore, turn our attention to the agreements and correspondence leading up to the execution of the SHA/County Deed. In 1988, appellees entered into the Bi–Party Agreement to accelerate the construction of Route 100 due to the fact that "developers [were] actively possessing subdivision plans and associated engineering drawings along the Route 100 corridor." Appellees agreed that it would be prudent to acquire land to develop Route 100 "prior to the residential/commercial development process to minimize damages to contiguous properties and to minimize the financial impact to [the SHA] associated with the land acquisition necessary for the further extension of [Route 100]." In furtherance of its

desire to minimize right-of-way acquisition costs, in 1989, the SHA entered into an agreement with King's Meade's predecessor, BritAm. In 1992, pursuant to the 1989 agreement, King's Meade transferred approximately 19.882 acres to the SHA, most of which comprise the Subject Property.

In furtherance of the Route 100 project, appellees entered into the 1996 Supplemental Agreement to resolve issues surrounding the southern shift in alignment of Route 100 and to assist with minimizing the financial impact associated with the land acquisition. The 1996 Supplemental Agreement details a comprehensive land exchange of twelve parcels of land, including the Subject Property. Appellees agreed that three parcels of land owned by the SHA, totaling approximately 52.5 acres, would be conveyed to the County by the SHA's form quitclaim deed and subject to a covenant that if "said property shall be used for any non transportation purpose, then [the SHA] shall have the right to re-enter and take possession of the property and terminate all right, title and interest of [the County] to said property, and all such right, title and interest of [the SHA] shall revert to the [the SHA]."

Importantly, the 1996 Supplemental Agreement expressly provides that the agreement was executed for the benefit of the State, the County and its citizens:

WHEREAS, [the SHA] and the COUNTY agree that the MD 100 PROJECT and the IMPROVEMENTS would be a *benefit to both parties of this SUPPLEMENTAL AGREEMENT* and a necessary accommodation for the *general traveling public* and that it promotes the health, safety, and general welfare of the *citizens of the State and the COUNTY.*

(Emphasis Added). There is nothing in the 1996 Supplemental Agreement to suggest that the restriction providing that the County "shall not use the herein conveyed property to allow its use for any non-transportation related purpose" was intended to benefit King's Meade, appellant or any former property owner of the 52.5 acres of land that the SHA owned.

King's Meade first expressed an interest in reacquiring the Subject Property from the SHA on August 3, 1999, almost three years after the execution of the 1996 Supplemental Agreement. For this reason, appellant's assertion that the SHA's inclusion of the Reverter Clause in the SHA/County Deed was in response to its asserted entitlement to repurchase the Subject Property pursuant to § 8–309(c)(1)(i) is flawed. Although the 1996 Supplemental Agreement would later be amended to change the prohibition on use of the Subject Property from a "non-transportation purpose" to a restriction on use for a "public purpose," as we will explain *infra*, appellees did not "change tack and enter into Amendment I" as a result of the demands of King's Meade's.

Upon learning of the 1996 Supplemental Agreement, counsel for King's Meade, on January 13, 2000, wrote to the SHA objecting to the conveyance and requesting that the "transportation purpose" be identified by the SHA. Responding on March 30, 2000, the SHA advised King's Meade that the previously agreed upon transportation-use reverter clause would be relaxed to allow the County to use the Subject Property for any public purpose pursuant to § 8–309(g).

Prior to the SHA's response, Amendment I had been drafted and was signed by the County Executive on March 29, 2000. At the time of drafting, appellees anticipated that the conveyance of the Subject Property would be presented to the Board of Public Works for its approval under § 8–309(g), as explained in the SHA letter. On April 18, 2000, the Administrator for the SHA signed Amendment I, thus executing the agreement. The language of Amendment I reaffirms that the agreement was executed for the benefit of appellees to the exclusion of King's Meade and its successors. Amendment I fails to suggest that, if the Subject Property reverts to the SHA due to a violation of the express covenant, any former owner of the property currently owned by the SHA would be offered the right of first refusal to reacquire the property. To the contrary, Amendment I expressly states that the terms of the 1996 Supplemental Agreement are to remain in full force and effect. Consequently, the Route 100 project and its

improvements were to be a "benefit to [appellees] and a necessary accommodation for the general traveling public."

Nevertheless, appellant maintains that appellees "acquiesced in King's Meade's position." On April 12, 2000, prior to the execution of Amendment I, counsel for King's Meade insisted that the SHA could not convey the Subject Property under § 8–309(g), unless the County could demonstrate a public purpose for the land. The SHA immediately responded, informing King's Meade that the proposed transaction would be governed by § 8–309(f). Undeterred, King's Meade objected to the conveyance pursuant to § 8–309(f). According to appellant, the SHA thereafter "acquiesced in King's Meade's position that the transfer to the County was not authorized by § 8–309(f)" and conveyed the property under § 8–309(g) with the Reverter Clause.

Although appellees argue that the conveyance was governed by § 8–309(f), as we discussed *supra,* the SHA/County Deed was executed pursuant to § 8–309(g). This fact, however, fails to demonstrate an intention to benefit King's Meade and its successors. Regardless of whether the SHA conveyed the Subject Property under subsection (f) or (g), pursuant to Md.Code (1985, 1995 Repl.Vol., 2000 Supp.) State Fin. & Proc. Article, § 10–305 [8] and its supplementing administrative regulations, the Board of Public Works was required to approve the conveyance and join in the execution of the deed. *See* State Fin. & Proc. § 10–305(b) (providing that the deed must be executed by the highest official of the unit and by the Board); COMAR 14.24.05.

---

**8.** Section 10–305, in relevant part, provides:

(a) Any real or personal property of the State or a unit of the State government may be sold, leased, transferred, exchanged, granted, or otherwise disposed of:

(1) to any person, to the United States or any of its units, or to any unit of the State government, for a consideration the Board decides is adequate; or

(2) to any county or municipal corporation in the State subject to any conditions the Board imposes.

In accordance with COMAR 14.24.05.02, the inclusion of the Reverter Clause was to "insure that maximum benefits to the State are realized by the utilization or disposal of [the Subject Property] for the most appropriate use which is compatible with the plans and programs of the State and local agencies." Appellant is unable to show that the Board of Public Works, as "party of the second part," intended the Reverter Clause to bestow upon King's Meade and its successors a direct benefit.

Since 1996, appellees had agreed that the SHA would convey the Subject Property to the County subject to a restriction on use. Although appellees relaxed the express covenant in Amendment I, it was always intended that they would benefit from the exchange. Because appellees agreed on March 29, 2000 and April 18, 2000 respectively, that the Subject Property would be conveyed to the County for a public purpose, any subsequent correspondence on the part of King's Meade, including its objections to the conveyance under § 3–309, are of no consequence.

Furthermore, counsel on behalf of the SHA advised King's Meade just two days prior to the execution of the SHA/County Deed that it was proceeding contrary to King's Meade's demands. The SHA explained that the "SHA's deed to the County contains a [R]everter [C]lause that states that if the land is not used for a public purpose, it will revert to [the SHA]. If that occurs, [the SHA] will deal with the reversion in an appropriate manner at that time. The reverter language *is the standard method* by which [the SHA] ensures that the land it sells will be used for a legitimate public purpose." (Emphasis added). The language of this letter does not state or imply that the Reverter Clause would be included in the SHA/County Deed for the benefit of Kings Meade or suggest that the Subject Property may be offered to King's Meade or its successors under § 8–309(c) if it were to revert to the SHA.

Lastly, appellant cannot legitimately claim that the Reverter Clause was included in the SHA/County Deed for the purpose of ensuring compliance with § 8–309 and that, in light

of § 8–309, the Reverter Clause bestows a benefit to which *only* King's Meade and its successors can enjoy. For this proposition, appellant relies upon the California Court of Appeal decision, *Zigas v. Superior Court*, 120 Cal.App.3d 827, 174 Cal.Rptr. 806 (1981). In *Zigas*, apartment tenants filed a class action suit against their landlords. The apartments were funded by federally insured mortgages under the National Housing Act (12 U.S.C. § 1701 *et seq.*). Pursuant to the Act, the landlords and the Department of Housing and Urban Development (HUD) entered into an agreement which prohibited the landlords from charging rent above the HUD approved rent schedule. *Zigas*, 174 Cal.Rptr. at 807–08. When the landlords raised rent in violation of the Act, the tenants sought to enforce the agreement as third party beneficiaries. The California appellate court held that "the purposes enunciated throughout the Act and the regulations promulgated thereunder, can leave no doubt that petitioners are members of the class which this legislation was intended to benefit" and that, because "it was clear that a HUD approval of rent increases could only benefit the tenants," the tenants were third party beneficiaries to the Act. *Id.* at 810.

According to appellant, this Court's decision in *Little v. Union Trust Co.*, 45 Md.App. 178, 412 A.2d 1251 (1980), is consistent with *Zigas* and instructive on the issue of whether the terms of a contract confer a direct benefit which only one party can enjoy. In *Little*, tenants filed a class action asserting that they were third party beneficiaries to a regulatory agreement between HUD and their landlords as required by the National Housing Act, which mandates landlords to keep rental premises in good repair and condition. We declined to extend third party beneficiary status to the tenants, holding that the purpose of the Act was to protect the "United States Government as insurer of the mortgages and that any benefit to the tenants was incidental and did not confer upon them the status of third party beneficiary." *Id.* at 182, 412 A.2d 1251.

Unlike *Zigas*, § 8–309(g), the statutory provision governing the SHA/County Deed, does not evidence an intent to

benefit King's Meade or its successors. Section 8–309(g) allows the SHA to exercise its discretion, subject to the approval of the Board of Public Works, to convey any of its surplus property to a State or local agency that needs the property for a public purpose at the time of the transfer. Although a conveyance under § 8–309(g) restricts the government agency's use of the property to a public purpose, it is not subject to a right of first refusal on the part of the former owner. Once the SHA conveys the property to the government agency, the possibility of future acquisition under § 8–309 is extinguished. Accordingly, § 8–309(g), by its terms, does not bestow upon appellant a benefit.

The SHA, however, included a Reverter Clause in the SHA/County Deed, explaining that "the reverter language is the standard method by which [the SHA] ensures that the land it sells will be used for a legitimate public purpose." The Reverter Clause provides:

TO HAVE AND TO HOLD the land and premises, hereinbefore described and mentioned, to the extent of the State's right, title and interest thereto, unto [the County], a body corporate and politic, its successors and assigns, so long as the said property shall be used for a public purpose. Notwithstanding anything to the contrary contained herein, in the event said property shall cease to be used for a public purpose, or is required at a future date for a transportation purpose, all right, title, and interest in same shall immediately revert to the State of Maryland to the use of the [SHA.]

The terms of the Reverter Clause do not confer a benefit that only King's Meade and its successors can enjoy. First, appellant fails to acknowledge the language of the clause, "in the event [the Subject Property] ... *is required at a future date for a transportation purpose,* all right, title and interest in same shall immediately revert to the [SHA]." (Emphasis added). Patently, the SHA benefits from this provision because it may use the Subject Property to accomplish a transportation purpose for which it is not required to pay the County any consideration. A reverter to the SHA for a

transportation purpose would be to the detriment of appellant as the possibility to reacquire the Subject Property would be foreclosed.

Assuming that the County failed to use the Subject Property for a public purpose and, therefore, title to the Subject Property immediately reverted to the SHA, under the statute, the SHA is not necessarily required to offer appellant the right of first refusal to reacquire the Subject Property. Under this scenario, the SHA would first determine whether there were any State or local needs for the Subject Property, which have priority under § 8–309. *See Selig*, 383 Md. at 674, 861 A.2d 710 (explaining that the section grants a county or municipality a priority of acquisition superior to that of the original owner).

In the case *sub judice*, the SHA has never determined whether the Subject Property may be needed for other State transportation purposes given the fact that the SHA had always intended to exchange the Subject Property with the County as part of the Route 100 project. Furthermore, according to the SHA, the Subject Property has never been submitted in accordance with the State Clearing House procedures as established by COMAR 14.24.05 ("preface" generally providing that "State agencies [are] to notify the Department of Budget and Fiscal Planning and the Office of Planning of any real property which is excess to the needs of the State agency or of any substantial change in use of any real property owned by the State").

Consequently, the Office of Planning has never notified all State and local agencies that the Subject Property is available, COMAR 14.24.05.04.C., State and local agencies have never had the opportunity to submit their interest in the Subject Property to the Office of Planning, COMAR 14.24.05.04.E., and the Board of Public Works has not had the opportunity to determine whether the Subject Property should be retained by the State for possible State use or conveyed to a State or local government with conditions that the Board may require. COMAR 14.24.05.04.G.

Assuming *arguendo* that the Subject Property had been through the State Clearinghouse prior to the exchange with the County, determinations as to proper disposition of the property in light of the current interests of governmental agencies would again need to be made. *See* COMAR 14.24.05.02 (providing that "[p]roper management and use of State resources requires a continuing and critical review of the real property held by the State to assure that it is being properly utilized").

Since the conveyance in 2000, amendments effective July 1, 2005, have been made to § 10–305(b) of the State Fin. & Proc. Article. *See id.*(1985, 2006 Rep. Vol., 2007 Supp.).[9] Section 10–305(b) now restricts the ability of the Board of Public Works from transferring property without notice to and possible involvement by the General Assembly.

Accordingly, the Reverter Clause has purposes unrelated to any benefit to appellant. These include the SHA's ability to use the Subject Property for a transportation purpose and/or to transfer the Property to another State or local agency that needs the Subject Property for a public purpose. The SHA benefits under every conceivable scenario. If the Subject Property were transferred to another governmental agency, the SHA would nevertheless benefit from the transfer to the

---

9. In pertinent part, § 10–305, entitled "Disposal of property," provides:
   (b)(2) The Board may not approve the sale, transfer, exchange, or grant of property until:
   (i) the Department of General Services has submitted to the Board two independent appraisals of the property that:
       1. with regard to real property, consider the value of any restrictive covenant that may be placed on the property; and
       2. may not be publicly disclosed if the property is to be sold at auction;
   (ii) the following information has been submitted, by electronic mail or facsimile and by certified mail, to the Senate Budget and Taxation Committee, the House Appropriations Committee, and, for property that meets both criteria of paragraph (1)(i) of this subsection, the Legislative Policy Committee:
       1. a description of the property; and
       2. if applicable, any justification for not selling, transferring, exchanging, or granting the property in a manner that generates the highest return for the State. . . .

extent that it received monetary or other consideration for the Subject Property. If, on the other hand, the Subject Property reverted to the SHA and there were no State or local needs for the property, the SHA would convey the Subject Property to appellant for its current market value. A conveyance to appellant would benefit the SHA, after having already received full consideration for the Subject Property from the County.

Appellant has failed to make an evidentiary showing that appellees intended to directly benefit King's Meade and its successors. As we explained in *Little*, "It is not sufficient to show that a party may derive some incidental benefit from a contract." 45 Md.App. at 181, 412 A.2d 1251. From the circumstances presented, at best, appellant may be deemed an incidental beneficiary with no rights to recover on or enforce the SHA/County Deed. For this reason, the trial court properly granted summary judgment in favor of appellee.

### E. Statute of Limitations

In appeals from grants of summary judgment, appellate courts, as a general rule, will consider only the grounds upon which the trial court relied in granting summary judgment. *Lovelace v. Anderson*, 366 Md. 690, 785 A.2d 726 (2001). In the instant case, the trial judge found that, "[i]n light of [its] ruling on the issue of [appellant's] ability to institute the present suit, an analysis of the arguments relating to whether the suit was filed within the applicable statute of limitations is unnecessary." Because we affirm the trial court's grant of summary judgment in favor of appellees, we need not reach this issue.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**