969 A.2d 284 (2009)
408 Md. 231
LOVELL LAND, INC.
v.
STATE HIGHWAY ADMINISTRATION, et al.
No. 92, September Term, 2008.
Court of Appeals of Maryland.
April 9, 2009.
*286 Kurt J. Fischer (Marta D. Harting and Melissa L. Mackiewicz of DLA Piper US LLP of Baltimore), on brief for petitioner.
Kevin Reynolds, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland of Baltimore), Melissa S. Whipkey, Asst. County Solicitor (Margaret Ann Nolan, Howard County Solicitor and Richard E. Basehoar, Senior Asst. County Solicitor, Howard County Office of Law of Ellicott City), on brief, for respondents.
Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, IRMA S. RAKER, (Retired, Specially Assigned) ALAN M. WILNER, (Retired, Specially Assigned) JJ.
WILNER, J.
This case involves a parcel of unimproved land that was acquired by the State Highway Administration (SHA) from King's Meade Limited Partnership (King's Meade) in 1992 for use in constructing an extension of Md. Route 100 in Howard County. When, because of a revision in the planned location of the road, it turned out that the parcel was not needed for that purpose, SHA, in 2000, deeded it to Howard County for public use.
In April, 2006, convinced that the county had not put the land to public use, petitioner, Lovell Land, Inc. (Lovell), claiming to be the successor-in-interest to King's Meade, filed an action in the Circuit Court for Howard County seeking (1) a declaratory judgment that, by virtue of both Maryland Code, § 8-309 of the Transportation Article (TR) and a reverter provision in the deed from SHA to the county, the county's title to the land reverted to SHA and SHA is required to offer the property to petitioner, and (2) an injunction requiring the county and SHA to implement that judgment.
In a Memorandum Opinion, the Circuit Court opined that petitioner had no right to the requested relief. Instead of entering a declaratory judgment to that effect, however, the court merely granted the motions for summary judgment filed by SHA and the county. Overlooking the absence of a declaratory judgment but in the belief that the Circuit Court correctly granted the motions for summary judgment, the Court of Special Appeals affirmed the judgment. Lovell Land v. State Highway, 180 Md.App. 725, 952 A.2d 414 (2008). We agree that petitioner has no right to the relief it requested, but we shall direct that the case be remanded to the Circuit Court for entry of a proper declaratory judgment in conformance with this Opinion.

BACKGROUND
In contemplation of a planned five-mile extension of Md. Route 100 from Interstate Route 95 to U.S. Route 29, SHA entered into two agreements in January 1988  one with Howard County, where the extension would be located, and one with BritAm Development Group, a partnership in which King's Meade was a general partner. Prompting those agreements was the fact that a number of developers were actively proceeding with subdivision plans with respect to property lying along the proposed Route 100 corridor, and SHA was not then in a position to acquire that property by purchase or condemnation.
*287 Under the agreement with Howard County, denoted the Bi-Party Agreement, the county, which had acquisition funds more immediately available, agreed to acquire, by purchase or condemnation, the land that might be needed for certain parts of the project, and SHA agreed to acquire the land needed for other parts and to reimburse the county for its costs and expenses. The agreement with BritAm involved mostly a land swap. It called for SHA to deed two parcels that it owned to King's Meade, one of 8.5 acres that King's Meade wished to use for its planned Brightfield subdivision (Parcel A), and one of 3.5 acres on which King's Meade would construct certain improvements along Md. Route 103 and then reconvey to SHA (Parcel B). In return, BritAm or King's Meade was to convey two parcels that it owned to SHA, one of 22 acres for the planned roadway (Parcel D) and one of 0.3 acres, to be transferred in connection with the Route 103 improvements (Parcel C).
In March 1990, in a completely separate transaction, the State sold to the county, for approximately $800,000, a 28.5-acre parcel owned by the University of Maryland System, on which the county intended to build some government facilities. That land was immediately adjacent to a 69-acre parcel that included the land subject to the January 1988 agreement between SHA and BritAm  the 22.3 acres to be conveyed to SHA and the 12 acres to be transferred to King's Meade. Two years later, in April, 1992, the 1988 agreement between SHA and BritAm was implemented through an exchange of deeds, although the acreage exchanged was less than that provided for in the agreement. The State, through SHA and the Board of Public Works (BPW), conveyed approximately 8.2 acres and paid $139,600 to King's Meade, and King's Meade conveyed 19.982 acres to the State, for the use of SHA.
At some point after those various transfers took place, the planned alignment of Route 100 shifted to the south. As a result of that shift, SHA needed 12.4 acres of the University of Maryland property the State had sold to Howard County in 1990, but part of the 19.982-acre parcel that SHA had acquired from King's Meade in 1992, which we shall assume was 17.3 acres, was no longer needed for the project.[1] In November, 1996, in light of that new circumstance, SHA and the county entered into a Supplemental Agreement intended to supplement the 1988 Bi-Party Agreement. The Supplemental Agreement also involved a land swap. The county agreed to transfer to SHA nine parcels of land totaling 47 acres, and SHA agreed to transfer to the county three parcels totaling 52.5 acres and pay the county $1.6 million. Included in the transfer to the county was the 17.3-acre portion of the 19.9 acre parcel that SHA had obtained in the swap with King's Meade, and included in the transfer to SHA was the 12.4-acre portion of the former University of Maryland land that the State had sold to the county in March 1990.
*288 The Supplemental Agreement expressly limited the use that could be made of the parcels being transferred to the county to a transportation purpose. The county agreed that it would not use any of that property for any non-transportation related purpose, that the State could enter the property to assure compliance with that restriction, and that, if any portion of the property was used for a non-transportation purpose, the State had the right to re-enter, take possession of the property, and terminate all right, title, and interest of the county. The land would then revert to the State, for the use of SHA. Although the Supplemental Agreement was signed in November 1996, the transfers contemplated in it did not take place until the spring of 2000.
To understand the context of what occurred next, a brief detour to TR § 8-309 is necessary. As a prelude to that detour, it is to be noted that the Route 100 extension was constructed and is in operation. It is therefore a completed, rather than an abandoned, project. Title 8 of the Transportation Article deals with highways; Subtitle 3 of Title 8 deals with the acquisition and disposition of property; and § 8-309, which is part of Subtitle 3, deals with the sale of land not needed for public purposes. The general purpose of the section, as set forth in TR § 8-309(a), is either to return to the tax rolls of the county land acquired by SHA but later found to be unneeded by it or to make it available for use by a county or municipality for a transportation-related purpose. TR § 8-309(b), which is the more particular mandate and is somewhat broader in scope, provides that if land acquired under the subtitle is not needed for any present or future State, county, or municipal transportation purpose "or other public purpose," SHA shall dispose of the land as soon as practicable after completion or abandonment of the project for which the land was acquired.
The statute then sets out the various ways in which that disposition may be accomplished. For purposes of this case, which involves a completed project, subsections (c), (e), (f), and (g) are particularly applicable.
Subsection (c), upon which Lovell principally relies, requires SHA, within 30 days after determining that land from a completed project is not needed by SHA, to inform the person from whom the land was acquired, or that person's successor in interest, that the land is not needed and is available for reacquisition. That person then has eight months to reacquire the land at a price determined in accordance with the statute. If the right of reacquisition is not exercised within eight months, SHA is directed to sell the land at public auction.
Subsection (e) permits SHA to exchange land from a completed project for privately or publicly owned land "of substantially equal value" when the land to be acquired is needed for a current State highway purpose that has been identified in the current consolidated transportation program approved by the General Assembly or that has otherwise received legislative approval for planning. Although there is no requirement that the exchange be with a county or municipality or that the land traded by SHA be used for a public purpose, any exchange is subject to a right of first refusal by the person from whom the land was acquired to reacquire the property. That right must be exercised within 90 days after SHA gives notice of the proposed exchange.
Subsection (f)(1)(i) permits SHA to convey any of its surplus land to an adjacent property owner "[a]s all or part of the consideration for right-of-way transaction" or under certain other circumstances. *289 There is no requirement that the land be used for a public purpose, and the transfer is not subject to a right of first refusal in the former owner. Finally, subsection (g) permits SHA, with the approval of BPW, to convey surplus land to any State or local agency that needs it for a public purpose and pays SHA the lesser of the appraised value of the land or the amount SHA paid for it, plus interest. Although a transfer under subsection (g) is not subject to a right of first refusal in the former owner, the law does require that the grantee need the land for a public purpose.
With that background, we return to the ensuing course of events, commencing with an exchange of letters between King's Meade or Lovell, on the one hand, and SHA or the Attorney General's Office, on the other. On August 3, 1999, Lovell, on behalf of King's Meade, wrote to SHA to "start the procedure for us to reacquire the surplus land" that was conveyed by King's Meade to SHA for the Route 100 Project, noting that the land was not used for the road due to a shift in alignment. In November, SHA responded that the land in question was to be conveyed to Howard County and sent Lovell a copy of the Supplemental Agreement. In January 2000, counsel for King's Meade wrote to the Assistant Attorney General who represented SHA, noting the covenant in the Supplemental Agreement that the land could not be used for a non-transportation-related purpose and inquiring as to the use the county intended to make of the land. Citing TR § 8-309, the letter advised that, if the property was not to be used for a transportation-related purpose, it must be offered to King's Meade and may not be deeded to the county.
The Attorney General then shifted course, twice. On March 30, 2000, the assistant attorney general responded that SHA and the county were in the process of amending the Supplemental Agreement to permit the county to use the property for a "public purpose," and that the conveyance would be made pursuant to TR § 8-309(g). That produced a response on April 12, in which counsel for King's Meade argued that the land could not be deeded to the county under subsection (g) because Howard County was neither a State nor a local agency and because, in any event, the county had not yet determined how the land would be used. The attorney asserted that any conveyance to the county would be "illegal and invalid" and demanded that SHA offer the property to King's Meade pursuant to TR § 8-309(c).
The assistant attorney general responded the next day, advising that she had "conducted additional research" and concluded that the transaction met the requirement of TR § 8-309(f)(1)(i), i.e., conveyance of surplus land to an adjacent property owner as all or part of the consideration for a right-of-way transaction. She noted that the county owned land adjacent to the unneeded parcel, that the land to be conveyed to the county was in exchange for land that SHA acquired from the county for the project, and that it therefore constituted "consideration for the right-of-way transactions" with the county. She concluded that, because the conveyance was being made pursuant to TR § 8-309(f)(1)(i), King's Meade had no right of first refusal and "no rights which impact on SHA's ability to convey this property," and she therefore did not need to address the use the county intended to make of the property. She did note, however, that the county had advised SHA "that the property will be used for a public purpose."
King's Meade was not persuaded. In a letter of April 18, 2000, it asserted that the land was never actually "taken" by SHA and therefore did not belong to SHA. That *290 peculiar conclusion was based on § 12-102 of the Real Property Article, which deals with "quick-take" condemnation and provides that property is deemed to be "taken" for that purpose if the plaintiff (1) is authorized to take property before trial, (2) has actually taken possession of it, and (3) has lawfully appropriated it to the public purposes of the plaintiff. Although urging that, because the property did not properly belong to SHA, the agency had no authority to convey the land to the county, it insisted that SHA convey the land it allegedly did not own to King's Meade.
Also on April 18, but in advance of its receipt of Lovell's letter, SHA and Howard County entered in an amendment to the 1996 Supplemental Agreement that struck the requirement that the county not use the property for a non-transportation-related purpose and substituted a requirement that the county use the property for "a public purpose." The amendment reflected a shift back to § 8-309(g). In the "Whereas" clauses, which the amendment incorporated into the agreement, SHA averred that restricting the county to a transportation related use was not required under TR § 8-309 and that, under § 8-309(g), SHA may convey the land to the county, with the approval of BPW, provided that the county's use was restricted to "a public purpose."
In point of fact, the deed implementing the conveyance to the county had been signed by both SHA and the county before the amendment to the Supplemental Agreement was executed and before SHA had actually received the April 12 and 18 letters from King's Meade. The deed had been presented to and accepted by Howard County on April 7, 2000 and was signed and acknowledged by SHA on April 12. It was presented to and approved by BPW on April 26, 2000 and was signed by the Board on May 3, 2000, which is when, subject to recording, it actually took effect. The deed contained a re-entry provision that we shall discuss further but which provided for a reversion of title to SHA in the event the SHA determined that the county was using the property for a non-public purpose and SHA chose to re-enter and retake the property.
On May 1, 2000, the assistant attorney general responded to the April 18 letter, rejecting as "misguided" King's Meade's construction of Real Property Article § 12-102 and observing that SHA acquired the land pursuant to a land exchange agreement with King's Meade and not by condemnation. The letter noted, as a "bottom line," that the county had represented that it would use the property for a public purpose and that SHA had relied on that representation, "just as it would rely on such a representation from any public entity," that the deed to the county contained a provision allowing the property to revert to SHA if the land is not used for a public purpose, and, if that occurred, "SHA will deal with the reversion in an appropriate manner at that time." The reverter language, it said, "is the standard method by which SHA ensures that the land it sells will be used for a legitimate public purpose."
King's Meade made no further protest until November 16, 2001, when it learned that the county was marketing the property for sale to a private party. It threatened SHA with a $ 1 million lawsuit if the agency did not exercise its rights under the reverter provision and offer the property to King's Meade. When alerted to that demand, the county informed SHA that the property had been mistakenly forwarded to the county's marketing team after being rejected for use as part of a school site, that the county council had not considered disposition of the property, and *291 that it would remain under the county's control and use. Based on that response, which was forwarded to King's Meade, the assistant attorney general, on December 7, 2001, informed King's Meade that SHA believed that the property was being used for a public purpose and that the reverter provision "has not been activated."
King's Meade and Lovell acquiesced in that response for more than four years, until April 25, 2006, when it filed its complaint for declaratory and injunctive relief. During that interim, the county proposed to use the property for two public projects  a central maintenance facility and a fire station. Evidence was presented that the county included those projects in its 2007 capital budget and that, at least by September 2005, Lovell was aware of those proposed uses.
In its complaint, Lovell claimed to be the successor to all of King's Meade's property, including its interest in the 17.3-acre parcel at issue here, and to be as well a third-party beneficiary of the reverter provision in the deed from SHA to the county.[2] It recited some of the facts noted above, averred that the county had not used the property for any public purpose, and asserted that, as a result, title to the property is required to revert to SHA and that, upon such a reversion, SHA is required to offer the property to Lovell. In Count I, it sought a declaratory judgment to that effect, and in Count II it sought an injunction requiring the county to convey the property to SHA and requiring SHA, within 30 days, to offer the property to Lovell at no more than its current market value.
SHA and the county answered the complaint and filed motions for summary judgment on the grounds that (1) Lovell was not a third-party beneficiary of any statutory or contractual provision concerning the property and therefore had no cognizable interest in the public use requirement or the reverter provision or any right to enforce them, (2) Lovell's claims were barred by limitations, and (3) the property had been designated for public use. At the hearing on the motion, it was conceded that the third issue, of whether the property had been put to public use, would require some discovery and was not ripe for summary judgment. The defendants did press the first two grounds, however. The county insisted that the conveyance was pursuant to TR § 8-309(f)(1)(i), not § 8-309(g), as contended by Lovell, and that no right of first refusal exists under subsection (f)(1)(i). Lovell responded that the conveyance was pursuant to subsection (g) but that, in light of the reverter provision in the deed, it did not matter.
In August 2007, the court filed a memorandum opinion and order granting the motions for summary judgment. The court concluded that, even though BPW appeared to approve the transfer to Howard County pursuant to TR § 8-309(f), the Supplemental Agreement and the deed indicated that the transfer was actually made pursuant to § 8-309(g). Relying on Mackubin v. Curtiss-Wright Corp., 190 Md. 52, 57 A.2d 318 (1948), however, the court concluded that Lovell was not a third-party beneficiary of the reverter provision and had no standing to enforce it. In light of that conclusion, which was dispositive, the court did not address the limitations defense.
Cross appeals were noted, Lovell asserting that it was a third-party beneficiary of the reverter provision and was entitled to *292 enforce it, and the defendants seeking to sustain the summary judgment on the ground that the transfer was pursuant to TR § 8-309(f)(1)(i), which did not require a public purpose, and that the action was barred by limitations. As noted, the Court of Special Appeals affirmed the summary judgments, principally for the reasons stated by the Circuit Court. It agreed that the transfer was made pursuant to TR § 8-309(g) but agreed as well that Lovell was not a third-party beneficiary of the reverter provision. Like the Circuit Court, it found no need to address the limitations issue. Lovell Land v. State Highway, supra, 180 Md.App. 725, 952 A.2d 414. We granted Lovell's petition for certiorari to consider whether the lower courts erred in declining to accord Lovell or King's Meade third-party beneficiary status. No cross-petitions were filed, so the limitations issue is not before us.

DISCUSSION
Before discussing the pivotal issue presented in the case  whether Lovell enjoys the status of third-party beneficiary with respect to the public use requirement and the applicable "reverter" clause  there are some preliminary issues that must be addressed.
First, we need to deal with the fact that, although this was predominantly a declaratory judgment action, the Circuit Court did not enter such a judgment but instead merely granted the defendants' motions for summary judgment. As we pointed out in Megonnell v. United Services, 368 Md. 633, 642, 796 A.2d 758, 764 (2002), "[w]hile it is permissible for trial courts to resolve matters of law by summary judgment in declaratory judgment actions, the trial court must still declare the rights of the parties." See also Beale v. Risk Retention Group, 379 Md. 643, 650, n. 4, 843 A.2d 78, 83, n. 4 (2004).
This proceeds from the more general rule that, when a declaratory judgment action is brought and the controversy is appropriate for resolution by declaratory judgment, "the court must enter a declaratory judgment, defining the rights and obligations of the parties or the status of the thing in controversy," and that judgment must be in writing and in a separate document. Allstate v. State Farm, 363 Md. 106, 117, n. 1, 767 A.2d 831, 837, n. 1 (2001); Union United Methodist v. Burton, 404 Md. 542, 550, 948 A.2d 1, 10 (2008). That requirement is applicable even if the action is not decided in favor of the party seeking the declaratory judgment. Ashton v. Brown, 339 Md. 70, 87, 660 A.2d 447, 455 (1995). The failure to enter a proper declaratory judgment is not a jurisdictional defect, however. This Court, in its discretion, may "review the merits of the controversy and remand for entry of an appropriate declaratory judgment by the circuit court." Bushey v. Northern Assurance, 362 Md. 626, 651, 766 A.2d 598, 611 (2001). That is what we shall do.
Second, there is the question of whether the transfer of the 17.3-acre parcel to the county was pursuant to TR § 8-309(f)(1)(i) or (g). As noted, if the conveyance was pursuant to subsection (f)(1)(i), as consideration for a right-of-way transaction, the former owner has no right of first refusal and there is no requirement that the grantee use the property for a public purpose. A conveyance under subsection (g) also is not subject to a right of first refusal, but the law does require that the property be used by the grantee for a public purpose. Lovell's position seems to be that the conveyance was under subsection (g), and that, even though there is no direct right of first refusal under that subsection, Lovell has the right to enforce the public use condition and exercise a right of *293 refusal as a third-party beneficiary of the "reverter" clause in the deed and under TR § 8-309(c).[3]
We see no reason why SHA could not have structured the conveyance of the 17.3-acre parcel under subsection (f)(1)(i). It was, as we have indicated, part of a swap, through which SHA acquired from the county, an adjacent land-owner, the 12.4-acre parcel that it needed for the Route 100 right-of-way and clearly constituted at least part of the consideration for that acquisition. Moreover, at least at one point, SHA, through its assistant attorney general, asserted that the conveyance was being made pursuant to subsection (f)(1)(i), and SHA claims that BPW approved it in that belief.[4]
The relevant documents, however, indicate much more persuasively that the ultimate conveyance was pursuant to subsection (g). The Amendment to the Supplemental Agreement that deleted the transportation use requirement in favor of a general public use requirement expressly references TR § 8-309(g) as authority for that substitution. Moreover, if a conveyance under § 8-309(f)(1)(i) was intended, there would have been no need for the public use requirement, either in the Amendment to the Supplemental Agreement or in the deed itself, and, as a result, there would have been no reason for the kind of "reverter" provision that was placed in the deed. We agree with the Circuit Court and the Court of Special Appeals, therefore, that the conveyance was made pursuant to TR § 8-309(g).
That brings into play the nature of the "reverter" provision in the May 2000 deed and whether Lovell has any third-party beneficiary interest in that provision and, as such, any right to enforce it. The deed, in fact, contains two reverter provisions, one in the granting clause and one in the habendum  to have and to hold  clause. Lovell, in its brief, and the two lower courts, in their respective opinions, have focused on the second but seem to have assumed that the first controls.[5]
*295 Lovell's position, in a nutshell, is that the public use requirement and the "reverter" provision in the 2000 deed to the county were inserted solely to ensure that SHA could comply with TR § 8-309(c) and thus "to confer a benefit that only one party [King's Meade] can enjoy under the terms of the statute ..." Lovell regards itself and King's Meade as "the only conceivable beneficiaries of the Reverter Clause." That argument, in turn, is premised to a large extent on the 1999-2001 correspondence between King's Meade and SHA, which Lovell regards as the impetus for inclusion of the public use and re-entry provisions and "overwhelming and uncontradicted evidence" that it was an intended beneficiary of those provisions.
In Mackubin v. Curtiss-Wright Corp., 190 Md. 52, 57 A.2d 318 (1948), this Court set forth the circumstances under which a person who was not a party to a contract could nonetheless sue to enforce a promise made in the contract. The Court explained that the original common law rule was that "privity" between the plaintiff and the defendant was necessary to maintain an action on a contract, which meant that one had to be a party to the contract in order to enforce it, even if the contract was for the benefit of a third person. The Court noted, however, that there had been a relaxation of that rigid rule and observed that "[t]he Courts now generally recognize the right of a third-party beneficiary to sue on a contract made expressly for the benefit of either a donee beneficiary or a creditor beneficiary." Id. at 56, 57 A.2d at 320-21. (Emphasis added). Adopting the approach of what was then 1 Restatement of Contracts, § 133, the Court defined:
(1) a donee beneficiary as one "where it appears that the purpose of the promisee in obtaining the promise of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary" and
(2) a creditor beneficiary as one "where no purpose to make a gift appears and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee, or a right of he beneficiary against the promisee which has been barred by the Statute of Limitations, or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds." Id. at 56, 57, 57 A.2d at 321.
Those two categories, the Court concluded, comprised the larger category of intended beneficiaries and held that "before a stranger to a contract can avail himself of the exceptional privilege of suing for a breach thereof, he must at least show that it was intended for his direct benefit." Id. The Court distinguished these "intended beneficiaries" from merely "incidental beneficiaries" and very clearly limited the right of a non-party to the contract to enforce a contractual promise or condition to the former category:
"An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee [citation omitted]. In order to recover it is essential that the beneficiary shall be the real promisee; i.e., that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit. It must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise."
*296 Id., at 58, 57 A.2d at 321 (Emphasis added).
The major, and ultimately decisive, distinction was thus between intended and incidental beneficiaries, the donee and creditor categories simply defining the persons who could be regarded as intended beneficiaries. The Mackubin case illustrated the distinction. The plaintiff owned stock in the defendant corporation, whose shares were listed on the New York Stock Exchange; she had also placed a continuing order to purchase additional shares at a set price. In the listing agreement with the stock exchange, the corporation promised to publish prompt notice to its stockholders of any action respecting dividends. The litigation arose when the corporation suspended a quarterly dividend but failed to publish prompt notice of that action. In the absence of such notice, the stock price rose to the point where the plaintiff's purchase order was activated but then dropped when the dividend suspension became known, and the plaintiff sued to recover her loss on the newly purchased stock. The Court concluded that, although the plaintiff, as an existing stockholder, may have been an intended beneficiary of the agreement with the stock exchange, she was not an intended beneficiary in her status as potential stockholder, and, as the breach affected her only in that "potential" capacity, she had no right to enforce the obligation.
In Spates v. Spates, 267 Md. 72, 296 A.2d 581(1972), the Court observed, in a footnote, that, in a tentative draft of the Restatement (Second) of Contracts, the distinction between donee and creditor beneficiaries had been abandoned, but the Court gave no indication that it intended to follow that approach. See id. at 77, n. 3, 296 A.2d at 584, n. 3. See also Addressograph-Multigraph v. Zink, 273 Md. 277, 280, 329 A.2d 28, 31 (1974). Indeed, the final version of the Restatement (Second) did abandon at least the donee/creditor terminology, as carrying "overtones of obsolete doctrinal difficulties." It clearly maintained, however, the more critical distinction between intended and incidental beneficiaries and maintained as well, within the comprehension of "intended beneficiaries," the substance of the donee and creditor categories. See Restatement (Second) of Contracts, Introductory Note to Ch. 14, § 302, and Reporter's Note to § 302.[6]
Notwithstanding the Restatement (Second), most courts seem to have retained the donee/creditor terminology. The current version of Williston's treatise on the law of contracts observes that elimination of the donee/creditor categories and the lumping of protected beneficiaries into one broad class has "not been well received by the courts, in part because of their familiarity with the traditional phraseology and in part because of its helpful, descriptive qualities." 13 Samuel Williston, A TREATISE ON THE LAW OF CONTRACTS, § 37.7 at 32-33 (4th ed. by Richard A. Lord 2000). Lord (Williston) continues:
"Regardless of the reasons for the courts' reluctance to embrace the terminology of the Restatement (Second) of *297 Contracts, the fact is that the vast majority of courts continue to speak of third party creditor and third party donee beneficiaries when considering protected beneficiaries, and of incidental beneficiaries when discussing those beneficiaries who may not recover."
Id. at 33. The latest reprint of 9 Arthur Linton Corbin, CORBIN ON CONTRACTS, § 774 (Interim Edition 2000 and 2006 Supplement) maintains the donee/creditor categorization and terminology. Compare 3 E. Allan Farnsworth, FARNSWORTH ON CONTRACTS, § 10.3 (3rd ed.2004), but note that Professor Farnsworth was the Reporter for the Restatement (Second).
It appears that the change made in Restatement (Second) was not one of substance, but only of terminology. The change does, however, create a problem for one seeking status as a creditor beneficiary, for, as noted, it limits what formerly was regarded as creditor beneficiary contracts to those in which performance of the promise will satisfy the promisee's obligation to pay money to the beneficiary. The current 4th ed. version of Williston notes that limitation  that Restatement (Second) "views creditor beneficiary contracts as those primarily involving the payment of money" or the delivery of commodities "easily convertible into money." 13 Samuel Williston (4th ed.), supra, § 37.12 at 98; see also § 37.13. Under that view, Lovell clearly would not qualify as a creditor beneficiary. To achieve third-party beneficiary status under the Restatement (Second) approach, Lovell would need to establish the criterion set forth in § 302(1)(b)  that "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." See 13 Williston, supra, § 37.12 at 98: "Less liquid obligations are left to Subsection (1)(b)."
For good reason, Lovell does not suggest that King's Meade was a donee beneficiary of the public use and re-entry provisions. Apparently unaware of the change made by Restatement (Second) and the 2000 edition of Williston, neither of which it cites, Lovell claims creditor beneficiary status under the approach of the first Restatement, as explained in the outdated 1959(3rd) edition of Williston's treatise, § 356. The status it actually seeks, however, is that described in § 302(1)(b) of the Restatement (Second), Lovell's point being that SHA had a duty under TR § 8-309(b), (c), and (g) to offer the property to it if the public use condition was not met, and that the public use and re-entry provisions were inserted in the deed solely to implement that obligation. It regards the 1999-2000 correspondence between King's Meade and SHA as proof of that fact. In making that argument, however, Lovell focuses primarily on King's Meade's own beliefs, demands, and threats and dismisses as largely irrelevant, at least for summary judgment purposes, SHA's consistent rejection of those beliefs, demands, and threats.
There are several fallacies in Lovell's argument. Under the standard set in Mackubin, which is wholly consistent with the substance of the Restatement (Second) approach, in order to enforce the public use and re-entry provisions, Lovell must show that King's Meade was "the real promisee"  that "it must clearly appear that the parties intend[ed] to recognize [King's Meade] as the primary party in interest and as privy to the promise." Mackubin, supra, 190 Md. at 58, 57 A.2d at 321. Even when viewing the evidence in a light most favorable to Lovell, as we must do, no such showing has been made.
There is no mention of King's Meade in either the deed or in any of the antecedent agreements between SHA and the county, *298 and, although it is not necessary to the creation of third-party beneficiary status that an intended beneficiary be specifically mentioned in the contract (see Restatement (Second) of Contracts, § 308), the lack of acknowledgment is certainly a factor to consider. The crucial fact, however, is that there is no evidence in this record that either the public use requirement or the re-entry provision was inserted into the deed to benefit King's Meade or because of King's Meade's insistence that it had an interest in the property under TR § 8-309. King's Meade never asked for such provisions. As we have observed, the deed to the county was signed by both SHA and the county before SHA was even aware of the April 12 and 18 letters from Lovell. The transaction itself  the Amendment to the Supplemental Agreement and the deeds  reflected a direct and unmistakable negation by SHA, BPW, and the county of any cognizable claim or interest by King's Meade or Lovell.
Since November 1999, when it first learned that SHA intended to convey the land to the county, Lovell's position consistently has been that SHA had no statutory authority to make that conveyance because no transportation or public use had been identified. King's Meade was never looking to get the land back through a reverter provision, but rather to preclude SHA from transferring the land to the county in the first place. Given the fact that SHA consistently had rejected King's Meade's assertion of a right to reacquire the property and ultimately acted in direct derogation of any such claim, there is no basis for even an inference that those provisions were inserted in the deed to benefit King's Meade or to satisfy "some actual or supposed or asserted duty" of SHA to King's Meade. It is clear from the record and the statutory context that the public use condition was inserted because it was required by TR § 8-309(g) and that the right of re-entry was included solely to allow the State to enforce that condition if it chose to do so.
Telling as well on the issue of whether King's Meade possibly could have been an intended beneficiary is the fact that, even if SHA or the State were to exercise the right of re-entry and retake title to the property, it would not necessarily be required to offer the property to Lovell. SHA is not required to dispose of the land to any private party under TR § 8-309(b)(1), including a former owner, unless the land "is not needed for present or future State, county, or municipal transportation purpose or other public purposes." (Emphasis added). That invokes § 5-310 of the State Finance and Procurement Art. (SFP) and regulations of the Department of Planning promulgated pursuant to that section and SFP § 5-203(b).
SFP §§ 5-203 and 5-310 deal with the Department of Planning. Section 5-310 requires each unit of the State Government to notify the Department of any real property that it does not need and for the Department then to determine whether any unit of the State Government or any local government is interested in the property. After notice (to certain members and committees of the General Assembly and adjacent property owners) and a hearing, the Department is directed to make a recommendation to BPW as to an appropriate disposition of the property. Regulations of the Department, adopted pursuant to SFP § 5-203(b) and codified in COMAR 14.24.05, implement the statutory scheme. That process, set forth in the Code and the regulations, must be exhausted before any offer is required to be made to the prior owner, which means that any State or local agency that may have a public use for the property has a priority over the former owner, who thus stands last in line.
*299 In light of that fact, especially when coupled with the evidence in this record, there is no way a court may reasonably conclude that the State, SHA, BPW, or the county intended to recognize either King's Meade or Lovell "as the primary party in interest and as privy to the [reverter provision]"  that either of those entities was "the real promisee" of that provision. At best, King's Meade may fall within the broad category of remotely possible incidental beneficiary of the reverter provision.
SFP § 5-310 and the implementing regulations do not constitute a "shell game," as Lovell suggests. They are a consistent and legitimate part of the overall approach that the General Assembly has chosen to govern the disposition of surplus land owned by a State agency. By giving an unduly narrow reading to TR § 8-309(a), (b), (c), and (g), Lovell believes that the predominant goal of the Legislature was to return surplus land to its former owner. That is not the case. The clearly predominant legislative purpose is to use such surplus land for a public use, even if not the one for which the land was initially acquired, and to offer the land back to its former owner only if no other State or local agency needs it for such a use.
We agree with the lower courts that Lovell is not a third-party beneficiary entitled to enforce the public use or re-entry provisions of the deed and is therefore not entitled to the relief it requested. We shall direct that the case be remanded to the Circuit Court for entry of a proper declaratory judgment to that effect, in conformance with this Opinion.
JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE JUDGMENT OF CIRCUIT COURT FOR HOWARD COUNTY AND REMAND TO THAT COURT FOR SUCH FURTHER PROCEEDINGS AS MAY BE NECESSARY AND ENTRY OF A DECLARATORY JUDGMENT IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.
NOTES
[1] There is an unresolved issue of whether the parcel in dispute is 15.8 or 17.3 acres. Petitioner contended that the parcel was 17.3 acres, although the undisputed evidence seems to be that only 15.8 acres of the property conveyed to the county had been acquired by SHA from King's Meade. Because the trial court, for summary judgment purposes, assumed that the parcel contained 17.3 acres, the Court of Special Appeals did not resolve that issue, although it did note that "there can be no dispute that King's Meade was the former owner to only 15.849 of the 17.337 acres." Lovell Land v. State Highway, supra, 180 Md.App. at 732, n. 2, 952 A.2d at 419, n. 2. As our decision is not affected by which is the correct number, we shall refer to the parcel as containing 17.3 acres, but, on remand, the trial court will need to make a specific finding.
[2] Although SHA and the county raised a question about Lovell's standing as a successor-in-interest to King's Meade, that issue was not resolved and need not be resolved in this appeal.
[3] TR § 8-309(h) gives the former owner a right to be offered a lease of unimproved property that is not to be used for any other public purpose. Lovell has not sought relief under that subsection.
[4] The only evidence in that regard is the Department of Transportation Action Agenda presented to BPW on April 26, 2000, noting that approval of the conveyance was requested "in accordance with Section 8-309(F)1(ii) of the Transportation Article, Annotated Code of Maryland." It is not at all clear that § 8-309(f)(1)(ii), which permits the conveyance of surplus land to an adjacent property owner if SHA believes that a public auction will adversely affect the value or use of the surplus land, has any application to the matter. It has been § 8-309(f)(1)(i) that has been asserted as the basis for the conveyance. The proposal was approved by BPW without discussion.
[5] The granting clause provides, in relevant part:

"That for and in consideration of the sum of One Dollar ($1.00), and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, so long as the property herein conveyed is used for a public purpose, the said parties of the first and second part [i.e., SHA and BPW] do hereby grant, convey, and quit claim unto HOWARD COUNTY, MARYLAND, a body corporate and public, its successors and assigns, all right, title and interest of the State Highway Administration and the State of Maryland, in and to [the property thereafter described]; however, in the event said property shall cease to be used for a public purpose, GRANTOR, its successors and assigns, shall have the right to reenter and take possession of the property and terminate all right, title and interest of GRANTEE, its successors and assigns, in and to the said property, and all such right, title and interest of GRANTEE shall revert to the State of Maryland to the use of the State Highway Administration, its successors and assigns, for no monetary consideration." (Emphasis added).
That provision is followed by an express reservation to the State of "the right to enter upon the herein described property for the purpose of making periodic inspections to determine whether there has been compliance with the covenants, conditions, limitations and restrictions hereinabove set forth."
The habendum clause provides:
"TO HAVE AND TO HOLD the land and premises, hereinbefore described and mentioned, to the extent of the State's right, title and interest thereto, unto HOWARD COUNTY, MARYLAND, a body corporate and politic, its successors and assigns, so long as the said property shall be used for a public purpose. Notwithstanding anything to the contrary contained herein, in the event said property shall cease to be used for a public purpose, or is required at a future date for a transportation purpose, all right. title and interest in same shall immediately revert to the State of Maryland to the use of the State Highway Administration of the Department of Transportation, its successors and assigns, free and clear of any liens and encumbrances imposed upon the property by the GRANTEE, or any successors or assigns."
(Emphasis added).
The habendum clause appears to be inconsistent with the granting clause with respect to whether a reversion is automatic or is at the option of the State. The granting clause gives the State the right, but not the obligation, to re-enter the land and terminate the county's right, title, and interest. The habendum clause appears to provide for an automatic reversion.
Those are two different things. The habendum clause would appear to create a classic possibility of reverter, i.e., the conveyance of a fee simple determinable estate, in which the estate conveyed is, itself, limited by the attached condition. In that setting, upon the happening of the triggering event  the failure or violation of the condition  the estate of the grantee automatically terminates, and ownership and the right to possession are returned to the grantor by operation of law. No action by the grantor is necessary to effect that reversion. See Mayor of Ocean City v. Taber, 279 Md. 115, 127-29, 367 A.2d 1233, 1240 (1977); Ringgold v. Carvel, 196 Md. 262, 272, 76 A.2d 327, 331 (1950); Rodeheaver v. State, 173 Md.App. 1, 917 A.2d 1122 (2007).
In contrast, the granting clause may be construed as conveying an estate in fee simple absolute, subject to a condition of public use, to which is attached a right of reentry. In that setting, the failure of the condition does not result in an automatic reversion of the estate, but merely gives the grantor a right to re-enter, eject the grantee, and retake the land. Rockville v. Walker, 86 Md.App. 691, 697, 587 A.2d 1179, 1182 (1991). The grantee's estate does not terminate until the grantor has exercised its right of re-entry. See 1 AMERICAN LAW OF PROPERTY § 4.12:
"The possibility of reverter is distinguished from the right of entry for condition broken in that it takes effect in possession automatically on the happening of the condition or event named in the creating instrument. But in the case of the right of entry, the grantor must elect to forfeit before the granted interest is terminated."
See also 2 Herbert Thorndike Tiffany, THE LAW OF REAL PROPERTY, 3d ed., § 314, at 11.
In a line of cases dating back to 1845, this Court, based on even more ancient English precedent, has made clear that, if there is an inconsistency between the granting clause and the habendum clause as to the nature of the estate conveyed, the granting clause prevails. See Budd v. Brooke, 3 Gill 235 (1845); Farquharson v. Eichelberger, 15 Md. 63, 72 (1860); Winter v. Gorsuch, 51 Md. 180, 183-84 (1879); Marshall v. Safe Deposit Co., 101 Md. 1, 13, 60 A. 476 (1905); Pritchett v. Jackson, 103 Md. 696, 698, 63 A. 965 (1906); Link v. MacNabb, 111 Md. 641, 647-48, 74 A. 825, 828 (1909); Callaway v. Forest Park Co., 113 Md. 1, 7, 77 A. 141, 143 (1910); and cf. Literski v. Literski, 166 Md. 641, 644, 171 A. 874, 875-76 (1934).
Although citing only to the habendum clause, Lovell at least tacitly recognizes that there has been no automatic reversion of the property to the State, notwithstanding the alleged failure of the public use condition. The relief requested is that SHA be required to exercise its right of re-entry which, if the habendum clause were to control, would be unnecessary. Accordingly, for purposes of this case, we shall assume that there has been no automatic reversion and that the only effect of the reverter provisions is to give the State the right to re-enter the property, oust the county, and retake both title and possession. We do observe that, in both clauses, the reverter is for the benefit of the State, for the use of SHA, not SHA itself, and that the State itself is not a defendant  only SHA and the Secretary of Transportation. Respondents have made no issue of that; nor shall we.
[6] Section 302 of the Restatement (Second) provides:

"(1) unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."